## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

**ALAN BENET BLOOM,**

     **PLAINTIFF,**

**VS.**                                        **CV NO.:**

**HEART OF ALABAMA FOOD
BANK, f/d/b/a Montgomery Area
Food Bank, Inc.,**

     **DEFENDANT.**                    **JURY TRIAL DEMANDED**

### COMPLAINT

### I.  JURISDICTION

1.     This action for injunctive relief and damages is brought pursuant to 28 U.S.C. §§ 1331, 1343(4), 2201, 2202, and 42 U.S.C. § 12101 *et seq*. This is a suit authorized and instituted pursuant to the Americans with Disabilities Act as amended, 42 U.S.C. § 12101, *et seq*. (ADA).  The jurisdiction of this Court is invoked to secure protection under the Acts, to redress Defendant's violation of the Acts and the deprivation of Plaintiff's rights, and, to secure injunctive relief and damages.

### II.  ADMINISTRATIVE EXHAUSTION

2.     At all times relevant to this Complaint, Defendant employed at least fifteen (15) people.

3.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), which raised claims of discrimination and retaliation under the ADA.  (Exhibit A: Charge of Discrimination).

4.     Plaintiff filed his Charge of Discrimination with the EEOC within 180 days of Defendant's decision to revoke Plaintiff's disability accommodations and terminate his employment.  (Exhibit A).

5.     Plaintiff filed this lawsuit within ninety (90) days of the EEOC's issuance of its Right-To-Sue letter.  (Exhibit B: Notice of Right to Sue).

### III.  PARTIES

6.     At all times relevant to this Complaint, Plaintiff Alan Benet Bloom (hereinafter "Plaintiff") has been a resident of Montgomery, Montgomery County, Alabama.  During the events of this case, Plaintiff performed work for the Defendant in the counties composing the Middle District of Alabama.  Thus, pursuant to 28 U.S.C. § 1391(b), venue for this action lies in the Middle District of Alabama, Northern Division.

7.     Defendant Heart of Alabama Food Bank, formerly doing business as Montgomery Area Food Bank, Inc. (hereinafter "Defendant"), is a non-profit corporation registered and doing business in the State of Alabama, and has sufficient minimum contacts with the State of Alabama that it is subject to service of process in Alabama.  Defendant is an entity subject to suit under 28 U.S.C. § 1331 and 42

U.S.C. § 12101 *et seq*. and 29 U.S.C. § 201, *et seq*. Therefore, this Court has

personal jurisdiction over Defendant.

## IV. STATEMENT OF FACTS

8.    Plaintiff hereby incorporates by reference each of the allegations

contained in paragraphs 1 through 7 above.

9.    Plaintiff is Disabled as defined by the Americans with Disabilities Act

as amended.

10.    Plaintiff suffers from Chronic Back Pain.

11.    Plaintiff's Chronic Back Pain significantly impacts his ability to walk,

sit and/or stand for prolonged periods of time, such that he is substantially limited as

compared to the average person in the general population.

12.    During the Fall of 2013, Defendant recruited Plaintiff.

13.    On Plaintiff's application for employment, he disclosed that he was a

Disabled veteran and suffered from pain in his back.

14.    During his recruitment process, Plaintiff disclosed that, due to his

Chronic Back Pain, the Department of Veteran Affairs had declared him 90%

disabled.

15.    With knowledge of his disability status, Defendant hired Plaintiff on or

about October 1, 2013.

16.     During the Fall of 2016, Plaintiff's Chronic Back Pain required him to undergo back surgery.

17.     Plaintiff and his physician completed Family Medical Leave forms regarding his back surgery.

18.     After verifying Plaintiff's need for leave, Defendant approved Plaintiff to utilize Family Medical Leave for his back surgery.

19.     Defendant employs or employed Richard Deem.

20.     From 2013 through Deem's resignation of employment, Defendant employed Deem as Chief Executive Officer.

21.     At all times relevant to this Complaint, Defendant's Chief Executive Officer acted as Plaintiff's direct supervisor.

22.     Following his 2016 back surgery, Plaintiff sought from Deem a temporary disability accommodation in the form of remote work while he recovered from his back surgery.

23.     At Deem's direction, Plaintiff provided Defendant documentation certifying his physical impairment and temporary need for remote work accommodations.

24.     During 2016, Defendant approved Plaintiff to temporarily work remotely on a "trial basis," through which it would evaluate Plaintiff's performance after two (2) weeks of working remotely.

25.    Deem notified Plaintiff that the two (2) week evaluation would determine whether Defendant would accommodate Plaintiff remotely throughout his entire convalescence period.

26.    When Defendant approved Plaintiff to work remotely, its Human Resources Department initially indicated that Plaintiff would be required to call and report each time that he started and stopped working.

27.    Defendant paid Plaintiff a salary.

28.    When working from the office, Defendant did not require Plaintiff to document or report his hours worked.

29.    Deem recognized that Defendant's reporting requirement was overly burdensome and notified Plaintiff that he did not need to comply with Defendant's directive.

30.    While working remotely in 2016, Plaintiff performed all essential functions of his position in a manner that met or exceeded Defendant's expectations.

31.    Defendant ultimately approved Plaintiff to work remotely for his full convalescence period of approximately eight (8) weeks.

32.    In late March 2020, Deem again approved Plaintiff to temporarily work remotely due to his wife's serious health condition.

33.    During December 2020, Plaintiff and Deem began discussing potential permanent remote work accommodations for Plaintiff's disabilities.

34.     On or about February 1, 2021, Defendant approved Plaintiff to work remotely Mondays, Wednesdays, and Thursdays each week.

35.     Defendant's periodic remote work accommodation limited Plaintiff's periods of prolonged walking, sitting, and standing.

36.     On May 31, 2021, Deem evaluated Plaintiff's performance when working under periodic remote work as "Exemplary."

37.     On May 31, 2022, Deem evaluated Plaintiff's performance when working under periodic remote work as "Exemplary."

38.     Defendant employs or employed Michael Coleman.

39.     On June 28, 2022, Defendant selected Coleman to replace Deem as Chief Executive Officer.

40.     On June 30, 2022, Coleman emailed Plaintiff and stated "It is my understanding that you perform some work from home and that this came from a past agreement with [Deem].  We need to discuss this right away because *it is not my intention to have anyone work from home* unless absolutely necessary." (emphasis added).

41.     Coleman directed Plaintiff to lay out his work schedule and the reasons for his remote work accommodations.

42.     Plaintiff complied with Coleman's direction, and the two met to discuss the nature of Plaintiff's disability.

43.     On July 21, 2022, Coleman emailed Plaintiff and stated "After discussing your work agreement under [Deem] with you (work periodic from home) and comparing that to the current needs of the organization as well as my desire for all employees to be treated equally, I have decided that beginning [tomorrow], it will be a requirement for you to report to work each day as required by all employees."

44.     Coleman did not identify any of Defendant's "current needs" that were burdened by Plaintiff's periodic remote work on Mondays, Wednesdays, or Thursdays.

45.     Coleman did not identify any tasks that required Plaintiff to be present in the office.

46.     Coleman did not identify any in-office tasks that Plaintiff could not complete while in the office on Tuesdays and Fridays or were required to be completed while in the office on Mondays, Wednesdays, or Thursdays.

47.     Coleman further notified Plaintiff that if his disability interfered with his ability to work in the office, he would "need to put in sick time/vacation time to cover any time away. . ."

48.     Coleman did not identify any alternative accommodations for Plaintiff's disability that would allow him to perform the essential functions of his position and limit the pain he experienced when sitting, standing, or walking for prolonged periods of time.

49.    Coleman did not engage in any interactive process to identify alternative accommodations for Plaintiff's disability that would allow him to perform the essential functions of his position and limit the pain he experienced when sitting, standing, or walking for prolonged periods of time.

50.    Coleman did not identify how Defendant suffered any undue burden

51.    On August 1, 2022, Plaintiff returned to working in the office from Monday through Friday.

52.    Following Plaintiff's return to the office, Coleman began eliminating Plaintiff's job duties.

53.    On August 15, 2022, Plaintiff emailed Coleman regarding the changes to his position and "where [he] fit" within the company.

54.    On August 15, 2022, Coleman indicated that his position would "become clearer" once Defendant's new Development Director began on August 18, 2022, and "[got] her department up and running."

55.    On or about August 22, 2022, Coleman informed Plaintiff that Defendant had eliminated his position.  (Exhibit C: Termination Letter).

56.    Coleman indicated that Defendant no longer had a position for Plaintiff.

57.    Upon information and belief, Coleman made the decision to eliminate Plaintiff's position.

58.     Coleman did not notify Plaintiff of any deficiencies in his performance before terminating his employment.

59.     When terminating Plaintiff's employment, Coleman clarified that Defendant's termination decision **was not** based on his performance.

60.     At the time of his termination, Defendant employed Plaintiff as Communications/ Public Affairs Officer.

61.     When terminating Plaintiff's employment, Coleman indicated that Plaintiff's duties as Communications/Public Affairs Officer "no longer warranted the expense [of his salary]."

62.     At the time of Plaintiff's termination, Defendant paid Plaintiff a salary of $56,559.36.

63.     Approximately two weeks before Defendant terminated Plaintiff's employment, Coleman directed him to turn over all information needed to prepare, produce, and maintain Defendant's newsletter to a third-party vendor.

64.     Upon information and belief, following Plaintiff's termination, Defendant paid a third-party vendor to temporarily prepare, produce, and maintain its newsletter.

65.     Defendant later hired a **Digital Media Specialist**.

66.     Upon information and belief, Defendant's Digital Media Specialist's duties included managing Defendant's newsletter and website.

67.    Following Plaintiff's termination, Defendant began advertising for the position of **Community Engagement Lead** on Indeed.com.

68.    Defendant's new **Community Engagement Lead** job posting listed the annual salary as between $41,000 and $54,000 per year.

69.    Upon information and belief, Defendant actively recruited for the position of **Community Engagement Lead**.

70.    Plaintiff was qualified to perform all essential duties of the **Community Engagement Lead** position with or without accommodations.

71.    The vast majority of the **Community Engagement Lead's** duties consisted of duties that Coleman had eliminated from Plaintiff's Communications/Public Affairs Officer position.

72.    Coleman did not notify Plaintiff of any deficiencies in his performance of the duties reallocated to the **Community Engagement Lead** position.

73.    Coleman did not notify Plaintiff of the newly created **Community Engagement Lead** position.

74.    Around the time of Plaintiff's termination, Defendant began advertising for the position of **Community Engagement/Volunteer Coordinator** on Indeed.com.

75.    Defendant's new **Community Engagement/Volunteer Coordinator** job posting listed the annual salary as between $41,000 and $54,000 per year.

76.     Defendant's new **Community Engagement/Volunteer Coordinator** position's role was to assist the **Community Engagement Lead** in the performance of their duties.

77.     Defendant's new **Community Engagement Lead** and **Community Engagement/ Volunteer Coordinator** shared Plaintiff's former Communications/Public Affairs Officer duties.

78.     Upon information and belief, Defendant actively recruited for the position of **Community Engagement/Volunteer Coordinato**r.

79.     Plaintiff was qualified to perform all essential duties **Community Engagement/Volunteer Coordinator** position with or without accommodations.

80.     Coleman did not notify Plaintiff of the newly created **Community Engagement/Volunteer Coordinator** position.

81.     Defendant's newly created **Community Engagement Lead** and **Community Engagement/ Volunteer Coordinator** positions had a combined salary expense between $82,000.00 and $108,000.00, which exceeded Plaintiff's salary of $56,559.36.

82.     Around the time of Plaintiff's termination, Defendant began advertising for the position of **Grant Writer** on Indeed.com.

83.     Defendant's new **Grant Writer** job posting listed the annual salary as between $40,000 and $50,000 per year.

84.    Upon information and belief, Defendant actively recruited for the position of Grant Writer.

85.    Plaintiff was qualified to perform all essential duties of the **Grant Writer** position with or without accommodations.

86.    Defendant hired Plaintiff as a Grant Writer in 2013.

87.    While employed as a Grant Writer, Plaintiff received positive reviews and commendations from his supervisors and **Defendant's Executive Director(s).**

88.    Due to Plaintiff's "Exemplary" performance as a Grant Writer, Defendant promoted Plaintiff to Grant Writer Supervisor.

89.    Plaintiff maintained his position of Grant Writer Supervisor until Defendant promoted him to Communications/Public Affairs Officer.

90.    While employed as a Grant Writer Supervisor, Plaintiff received positive reviews and commendations from his supervisors and **Defendant's Executive Director(s).**

91.    Coleman did not offer to demote Plaintiff to **Grant Writer** in lieu of termination.

92.    Coleman did not notify Plaintiff of the newly created **Grant Writer** position.

93.    Upon information and belief, Defendant hired individuals who did not identify as Disabled to its **Community Engagement Lead, Community Engagement/ Volunteer Coordinator,** and **Grant Writer** positions.

94.    In the weeks leading up to Plaintiff's termination, Coleman announced that Defendant would be changing its name.

95.    Coleman announced a renaming competition wherein employee's suggested new names for Defendant and whomever suggested the name Defendant chose would win $200.00.

96.    Plaintiff suggested that Defendant adopt the name of his newsletter, "Heart of Alabama" as its new name.

97.    During August 2023, Defendant announced that it had chosen "Heart of Alabama" as its new name.

98.    Defendant did not compensate Plaintiff for selecting Defendant's new name.

**V.  COUNT ONE – ADA – Discrimination (Failure to Accommodate)**

99.    Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 98 above as if fully set forth herein.

100.   Plaintiff suffers from Chronic Back Pain.

101.   Plaintiff's Chronic Back Pain significantly impacts his ability to walk, sit and/or stand for prolonged periods of time, such that he is substantially limited as compared to the average person in the general population.

102.   On February 1, 2021, Defendant agreed to provide Plaintiff *permanent* disability accommodations for his Chronic Back Pain in the form of working remotely on Mondays, Wednesdays, and Thursdays.

103. Before   Defendant   agreed   to   provide   Plaintiff   *permanent* accommodations, it verified that he specifically needed remote accommodations.

104. Before   Defendant   agreed   to   provide   Plaintiff   *permanent* accommodations, it verified that his disability would not improve.

105.   Defendant   initially   granted   Plaintiff   *permanent*   accommodations pending his remote work performance.

106.   While under periodic remote accommodations, Defendant consistently rated Plaintiff's performance as "Exemplary."

107.   From February 1, 2021 through July 21, 2022, Defendant provided Plaintiff disability accommodations in the form of periodic remote work.

108.   On June 28, 2022, Defendant hired a new Chief Executive Officer, Michael Coleman.

109.   On June 30, 2022, Coleman emailed Plaintiff and stated "It is my understanding that you perform some work from home and that this came from a

past agreement with [Deem].  We need to discuss this right away because ***it is not my intention to have anyone work from home*** unless absolutely necessary." (emphasis added).

110.   Plaintiff discussed his need for accommodation with Coleman at length.

111.   Coleman had access to Plaintiff's medical documentation verifying his need for disability accommodation.

112.   On July 21, 2022, Coleman revoked Plaintiff's disability accommodation of periodic remote work.

113.   Coleman did not identify or propose any alternative accommodations for Plaintiff's disability that would allow him to perform the essential functions of his position and limit the pain he experienced when sitting, standing, or walking for prolonged periods of time.

114.   Coleman did not engage in an interactive process to determine alternative accommodations for Plaintiff's disability that would allow him to perform the essential functions of his position and limit the pain he experienced when sitting, standing, or walking for prolonged periods of time.

115.   Coleman did not identify how Defendant suffered any undue burden as a result of Plaintiff's previous accommodations.

116.   On July 21, 2022, Coleman informed Plaintiff that when his Chronic Back Pain prevented him from reporting to the office, he must utilize Paid Time Off.

117.   On August 1, 2022, Plaintiff returned to working in the office from Monday through Friday.

118.   In violation of the Americans with Disabilities Act as amended, beginning on August 1, 2022, Defendant failed to accommodate Plaintiff's disability.

119.   As a result of Defendant's violation of the ADA, Plaintiff has been damaged, suffering physical and mental anguish.

## VII.   COUNT TWO – ADA – Retaliation (Retaliatory Discharge)

120.   Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 119 above as if fully set forth herein.

121.   Plaintiff suffers from Chronic Back Pain.

122.   Plaintiff's Chronic Back Pain significantly impacts his ability to walk, sit and/or stand for prolonged periods of time, such that he is substantially limited as compared to the average person in the general population.

123.   From February 1, 2021 through June 30, 2022, Defendant provided Plaintiff disability accommodations in the form of periodic remote work.

124.   On June 28, 2022, Defendant hired a new Chief Executive Officer, Michael Coleman.

125.   On June 30, 2022, Coleman emailed Plaintiff and indicated that he personally opposed remote work accommodations.

126.   On July 21, 2022, Coleman formally revoked Plaintiff's remote work accommodations.

127.   On August 1, 2022, Plaintiff returned to working in the office Monday through Friday.

128.   Coleman did not identify how Defendant suffered any undue burden as a result of Plaintiff's previous accommodations.

129.   Following Plaintiff's return to the office full-time, Coleman did not provide any disability accommodations for his Chronic Back Pain.

130.   Following his return to the office full-time, Coleman began eliminating Plaintiff's job duties.

131.   On August 23, 2022, Coleman terminated Plaintiff's employment.

132.   When terminating Plaintiff's employment, Coleman indicated that Plaintiff's duties as Communications/Public Affairs Officer "no longer warranted the expense [of his salary]."

133.   At the time of Plaintiff's termination, Defendant paid Plaintiff a salary of $56,559.36.

134.   Following Plaintiff's termination, Coleman created two new positions (**Community Engagement Lead** and **Community Engagement/Volunteer Coordinator**) to perform Plaintiff's duties as Communications/Public Affairs Officer.

135.   Following his termination, Defendant actively recruited for the new positions needed to perform Plaintiff's duties (**Community Engagement Lead** and **Community Engagement/Volunteer Coordinator).**

136.   Defendant's newly created **Community Engagement Lead** and **Community Engagement/ Volunteer Coordinator** positions had a combined salary expense between $82,000.00 and $108,000.00, which exceeded Plaintiff's salary of $56,559.36.

137.   Defendant also began recruiting for Plaintiff's former position of **Grant Writer**.

142.   Coleman selected individuals who did not need remote work accommodations for the roles of **Community Engagement Lead, Community Engagement/ Volunteer Coordinator**, and **Grant Writer**.

144.   In violation of the Americans with Disabilities Act as amended, Defendant retaliated against Plaintiff due to his previous need for remote work accommodations in the workplace by eliminating his position due to alleged monetary needs but subsequently hired *two* individuals to simultaneously perform Plaintiff's former duties at a collectively higher salary as **Community Engagement Lead** and **Community Engagement/ Volunteer Coordinator**, and not demoting Plaintiff to his former role of **Grant Writer**.

145.   As a result of Defendant's violation of the ADA, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

## VIII.   COUNT THREE – ADA – Discrimination (Discriminatory Discharge)

146.   Plaintiff adopts by reference each and every material averment contained in paragraphs 1 through 145 above as if fully set forth herein.

147.   Plaintiff suffers from Chronic Back Pain.

148.   Plaintiff's Chronic Back Pain significantly impacts his ability to walk, sit and/or stand for prolonged periods of time, such that he is substantially limited as compared to the average person in the general population.

149.   From February 1, 2021 through June 30, 2022, Defendant provided Plaintiff disability accommodations in the form of periodic remote work.

150.   On June 28, 2022, Defendant hired a new Chief Executive Officer, Michael Coleman.

151.   On June 30, 2022, Coleman emailed Plaintiff and indicated that he personally opposed remote work accommodations.

152.   On July 21, 2022, Coleman formally revoked Plaintiff's remote work accommodations.

153.   On August 1, 2022, Plaintiff returned to working in the office Monday through Friday.

154.   Following Plaintiff's return to the office full-time, Coleman did not provide any disability accommodations for his Chronic Back Pain.

155.   Following Plaintiff's return to the office full-time, Coleman began eliminating his job duties.

156.   On August 23, 2022, Coleman terminated Plaintiff's employment.

157.   When terminating Plaintiff's employment, Coleman indicated that Plaintiff's duties as Communications/Public Affairs Officer "no longer warranted the expense [of his salary]."

158.   At the time of Plaintiff's termination, Defendant paid Plaintiff a salary of $56,559.36.

159.   Following Plaintiff's termination, Coleman created two new positions (**Community Engagement Lead** and **Community Engagement/Volunteer Coordinator)** to perform Plaintiff's duties as Communications/Public Affairs Officer.

160.   Following his termination, Defendant actively recruited for the new positions needed to perform Plaintiff's duties (**Community Engagement Lead** and **Community Engagement/ Volunteer Coordinator).**

161.   Defendant's newly created **Community Engagement Lead** and **Community Engagement/ Volunteer Coordinator** positions had a combined

salary expense between $82,000.00 and $108,000.00, which exceeded Plaintiff's salary of $56,559.36.

162.  Defendant also began recruiting for Plaintiff's former position of **Grant Writer**.

164.  Coleman selected individuals who did not need disability accommodations for the roles of **Community Engagement Lead, Community Engagement/ Volunteer Coordinator**, and **Grant Writer**.

166.  In violation of the Americans with Disabilities Act as amended, Defendant discriminated against Plaintiff due to his disability status by eliminating his position due to alleged monetary needs but subsequently hired *two* individuals to simultaneously perform Plaintiff's former duties at a collectively higher salary as **Community Engagement Lead** and **Community Engagement/ Volunteer Coordinator**, and not demoting Plaintiff to his former role of **Grant Writer**.

167.  As a result of Defendant's violation of the ADA, Plaintiff has been damaged, suffering loss of pay, benefits, and mental anguish.

## IX.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

A.    Grant Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the

Defendant and at the Defendant's request from continuing to violate the terms of the Americans with Disabilities Act;

B.      Enter an Order requiring the Defendant to make Plaintiff whole by awarding reinstatement to the position he would have had, had he not been terminated;

C.      Award him back pay, together with employment benefits, front pay, compensatory damages, punitive damages, special damages, nominal damages;

D.      Attorneys' fees and costs;

E.      Plaintiff requests that the Court award Plaintiff equitable relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 12101, *et seq.* that the actions of Defendant violated the law; and,

F.      Any different or additional relief as may be determined by the Court to which Plaintiff is entitled.


[INTENTIONALLY LEFT BLANK]

_____
Allen D. Arnold

_____
Whitney Morgan Brown

**OF COUNSEL:**

ALLEN D. ARNOLD, Attorney at Law
6 Office Park Circle, Suite 209
Birmingham, AL 35223
T: (205) 252-1550
ada@allenarnoldlaw.com

**PLAINTIFF REQUESTS TRIAL BY STRUCK JURY**

_____
OF COUNSEL

**DEFENDANT'S ADDRESS:**
Heart of Alabama Food Bank
*Formerly* Montgomery Area Food Bank
c/o Robert L. Martin
561 Trade Center Street
Montgomery, Alabama 36108